RECEIVED

JUL 1 3 2005
ROBERT H. SHEWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
MONROE LOUISIANA

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**MONROE DIVISION**

| | |
|---|---|
| **SHEREE A. JACOBI** | **CIVIL ACTION NO. 3:03-1090** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **FEDERAL EXPRESS SERVICES CORPORATION** | **MAG. JUDGE JAMES D. KIRK** |

### RULING

Plaintiff Sheree A. Jacobi ("Jacobi") brought this lawsuit against her former employer Federal Express Service Corporation ("FedEx Services"), alleging sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* and Louisiana's anti-discrimination law, La. Rev. Stat. § 23:332,[1] and retaliatory discharge under Title VII. Before the Court are a Motion for Summary Judgment [Doc. No. 35] filed by FedEx Services and two related motions: a Motion to Strike Certain Exhibits and Portions of Plaintiff's Statement of Disputed Facts and Brief in Opposition to Defendant's Motion for Summary Judgment ("Motion to Strike") [Doc. No. 54] filed by FedEx Services and an Opposition to Defendant's Motion to Strike and Motion for Leave to File Plaintiff's Affidavit ("Motion for Leave") [Doc. No. 60] filed by Jacobi.

For the following reasons, the Motion for Leave is GRANTED, the Motion to Strike is GRANTED IN PART, and the Motion for Summary Judgment is GRANTED.

---

[1] In her Third Amended Complaint, Jacobi withdrew a previously asserted age discrimination claim.

## I.    FACTS AND PROCEDURAL HISTORY

In 1995, Jacobi became an employee of Federal Express Corporation d/b/a FedEx Express, working in sales in the Monroe, Louisiana, area.

On June 1, 2000, Jacobi was hired by FedEx Services as an Account Executive. At the time she was hired by FedEx Services, Jacobi received an employee handbook which contained the company policies prohibiting sexual harassment, encouraging employees to report harassment, and stating that there will be no retaliation against employees who report harassment.

As an Account Executive, Jacobi was responsible for making calls on customers and prospective customers in a geographic territory covering northern Louisiana and southern Arkansas. She was evaluated on her ability to meet certain revenue goals. Each Account Executive is assigned revenue goals based upon the expected expenditures on FedEx shipping services by customers located in his or her territory. These goals are derived from a computer program and are based on the revenue history of shipping customers in each territory, with emphasis on the revenue from the most recent three months, combined with economic forecast information by FedEx economists at corporate headquarters in Memphis, Tennessee. The Sales Planning Department in Memphis calculates the revenue goals using a mathematical algorithm and distributes the territory revenue goals to the sales management team. Each Account Executive receives revenue goals for his or her territory in three categories of services: (1) express shipping, (2) ground shipping, and (3) international shipping. Meeting revenue goals is the most important factor for evaluating Account Executives.

Account executives report to a District Sales Manager. A District Sales Manager receives the revenue goals for the territories assigned to him or her from the Sales Planning Department, but can alter the goals by shifting some of the revenue goals from one territory to another.

From June 2000 until May 2001, Jacobi reported to District Sales Manager Jared Oakley

2

("Oakley").[2]

In March 2001, Oakley e-mailed Jacobi regarding three customer complaints about her failure to keep appointments and lack of follow-up on their issues. Oakley acknowledged that Jacobi had met her revenue goals, but pointed out that she needed to address these complaints. Jacobi responded to Oakley's concerns with explanations regarding each of the three customers, and no further action was taken.

In May 2001, Oakley reprimanded Jacobi in an e-mail for failing to enter sales call information into FedEx Services's computer system, as is required of all Account Executives. He noted that she had not responded adequately to earlier e-mails about this same issue. Jacobi contends that she was ill and unable to enter the calls by the deadlines for two separate weeks.

Later that same month, on May 29, 2001, Oakley rated Jacobi's performance in an annual review as 1.8 on a scale of 4.0. In the report, it was noted that Jacobi failed to meet her revenue goals for express shipments and international shipping for the past two quarters. She also averaged six sales call per day when the goal was eight. Oakley prepared an "action plan" to improve Jacobi's performance, including improved attendance, meeting the minimum sales call goal and entering the calls into the computer, ensuring reports and responses to requests for information were timely, and ensuring immediate follow-up with customers. The action plan warned that Jacobi could face disciplinary action unless she took these steps.

The performance review included both objective and subjective criteria. Jacobi notes that the sales call goal is normally weighted or reduced if the employee was on leave during the review period. Although she had been ill for 45 days during this review period because of serious back problems

---

[2]Jacobi does not contend that Oakley sexually harassed her.

3

necessitating surgery, Oakley did not reduce her sales call goal. Jacobi contends that Oakley's complaints about her absenteeism and her revenue goals were a result of her back problems.

On or about June 1, 2001, Jacobi began reporting to District Sales Manager Ben Jones ("Jones"). Jones, who was based in Memphis, met with his sales team once a month and individually with Jacobi once every couple of months. His individual visits with Jacobi usually lasted about two days.

In October 2001, Jones reprimanded Jacobi after receiving a complaint from the manager of a FedEx station in El Dorado, Arkansas, that she had called one of the dispatchers an "idiot." In an e-mail, Jacobi had stated that she "needed someone with some intelligence to work with in dispatch. Do you have any suggestions?" Although the manager admitted that the dispatcher's "written communication skills may not be top notch," the manager was upset that Jacobi had referred to the dispatcher as an idiot. Jacobi admits that she "could have" called the dispatcher an idiot, although not to her face.

In January 2002, Jones rated Jacobi's performance in an annual review as 2.8 on a scale of 4.0. He noted that Jacobi failed to meet her revenue goals for express shipments and ground shipping. Jacobi exceeded her international goal with a score of 121.5%. She achieved 95.2% of her express goal and 97.8% of her ground goal. Jacobi points out that only one Account Executive under Jones's supervision, Sharon Gray, met her goals during this time period.

During his supervision of her, Jones allegedly often told Jacobi that he liked her and asked her to have a drink or have dinner with him when they worked together. She did not report Jones's conduct.

On or about March 4, 2002, Jacobi and Jones took a customer to dinner at a restaurant in the Horseshoe Casino in Shreveport. After dinner, Jacobi and Jones went to a bar where they had drinks

4

and played three games of pool. She alleges that while Jones was racking up the pool balls, he said that if he won she would have to "drop [her] pants." Jacobi responded, "I don't think so." Jacobi alleges that Jones made the same statement three or four times. He did not make any other comments of a sexual nature and did not touch her in a sexual manner that night.

Jacobi reported Jones's actions to Laz Owens ("Owens"), who sent her a complaint form. After her complaint to Owens, on or about April 24, 2002, Jacobi sent an e-mail to Joan Helms ("Helms"), the Human Resources contact person for FedEx Services. Jacobi complained that she had been discriminated against because she had not received a promotion to the position of Senior Account Executive,[3] but did not mention the alleged incident with Jones. She stated that she saw "age, gender and race discrimination in this company." Helms responded that promotions were no longer awarded based on years of service, but had to be earned, and that more was required of sales employees because FedEx faced stiff competition. Helms pointed out that Jacobi's past three performance scores had all been below 3.0 and that one had been 1.8, a below satisfactory rating.

On May 1, 2002, Jacobi filed an internal complaint of sexual harassment against Jones by completing the company complaint form and faxing it to Owens. FedEx Services conducted an investigation of Jacobi's complaint. Jones denied that he had even played pool with Jacobi and denied making any sexual comments to her. He pointed out that his check-in time at the hotel in Shreveport demonstrated that Jacobi's timeline was not accurate. Jacobi attempted to obtain corroboration, but was unable to do so.

Jones did not make any comments of a sexual nature to Jacobi after the alleged March 4, 2002 incident. However, according to Jacobi, Jones became caustic, rude, and demeaning to his

---

[3]Jacobi did not file a Charge of Discrimination with the Equal Employment Opportunity Commission regarding this claim.

subordinates, male and female. For example, she alleges that he interrupted employees in the middle of their conversations and also told employees that they did not know what they were talking about in front of their co-workers or during conference calls.

On or about June 18, 2002, Jacobi attended a dinner meeting in Little Rock, of approximately fifteen FedEx Services employees. All the employees were seated at two round tables. Jones joined Jacobi's table, and the employees had to move their chairs over to make room for him. When he sat down next to Jacobi, his knee touched her knee under the table.

On August 14, 2002, Jacobi met with Jones for a performance review. Jones gave her a rating of 1.86 on the basis that she failed to meet her revenue goals for several consecutive quarters. He gave Jacobi examples of documents that had been used by her peers to grow their revenues, including Cost Benefits Analysis reports ("CBAs") and Account Reviews.

On September 25, 2002, Jones issued a Letter of Counseling for Unacceptable Performance to Jacobi. Jones noted that Jacobi had failed (1) to meet her revenue goals for three consecutive quarters, (2) to document her use of CBAs and Account Reviews as instructed during the August performance review, and (3) to update her computerized sales call reports in a timely manner. Jacobi was warned that continuance of these problems could result in more severe discipline, up to and including termination.

On November 25, 2002, Jones issued a Letter of Warning for Unacceptable Performance to Jacobi. In the letter, Jones noted that, if current trends continued, Jacobi would fail to meet her revenue goals for a fourth consecutive quarter. He also noted that Jacobi had failed to meet her daily goal of eight sales calls for two consecutive months. This letter also again warned that if her performance continued to be unacceptable, she could be subjected to more severe discipline, up to and including termination.

6

On November 29, 2002, Jones instructed Jacobi to schedule time to ride along with Linda Womack, a peer Account Executive in a similar market who consistently met her revenue goals. Jones intended for Jacobi to observe Womack's sales calls and use of CBAs and Account Reviews. Although Jacobi scheduled a ride along, it was later cancelled. Jacobi never went on a ride along with Womack.

On December 4, 2002, Jacobi and Jones went on sales calls together. Two different times that day, Jacobi alleges that Jones nudged her foot to get her attention and mouthed the word "bitch." Jacobi does not allege that Jones touched her or said anything offensive to her after this date.

On this same date, December 4, 2002, Jacobi filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that she had been discriminated against on the basis of sex and age and that she had been retaliated against for reporting that her supervisor sexually harassed her. She claimed in the charge that she had been harassed based on the following actions: (1) she had been given an extra international goal in May 2002, (2) she had been threatened with discharge on September 25, 2002, (3) she had been notified on November 29, 2002, that she would be taken out of her sales territory on December 9, 2002, and (4) her supervisor had stated that he was going to call on her customers the week of December 2, 2002.

In January 2003, Jones gave Jacobi a performance rating of 1.84, noting that she failed to meet her revenue goals for four consecutive quarters. Jacobi alleges that Jones hindered her efforts to meet those goals by failing to obtain certain pricing for Jacobi's larger accounts, refusing to sign her expense reports, and keeping supplies from her that he obtained for other employees.

During the first half of fiscal year 2003, Jones raised Jacobi's international goal from 3.2% to 5% in accordance with a new rule from the compensation department. According to Jones, this new rule affected at least five team members' goals.

7

On or about February 25, 2003, Brooke Harwood ("Harwood), Jones's supervisor, notified Jacobi that she was being transferred to the supervision of the District Sales Manager located in New Orleans, Scott Kiedrowski ("Kiedrowski"). Kiedrowski reported to Dave Brown ("Brown"), a Director in Jacksonville, Florida. As a result of her transfer, both Jones and Harwood were removed from Jacobi's chain of command generally, but Jones retained control over the closing of new business.

Jacobi does not allege that she was subjected to sexual harassment or discrimination by Kiedrowski or Brown.

In March 2003, Jacobi notified Kiedrowski that one of the customers in her territory with a potentially large volume of shipping business had stopped using FedEx Services. When Kiedrowski reviewed Jacobi's call records, they indicated that she had not made an in-person sales call on the customer since January 15, 2003, although she had made contact by telephone.

On March 24, 2003, the EEOC issued a Notice of Right to Sue to Jacobi.

On March 26, 2003, Kiedrowski issued a memo to Jacobi outlining specific items he expected her to accomplish to improve her revenues by May 31, 2003. Jacobi was instructed to take the following actions:

(1)     Call on five identified target accounts in each category of shipping every two weeks,

(2)     present and report in her call comments either a CBA or Account Review to each identified target account,

(3)     present Account Reviews to her top 15 declining accounts,

(4)     document eight completed sales calls per day,

(5)     call on her top 15 declining accounts, her top 15 increasing accounts, and her top 15 revenue accounts every two weeks.

8

Kiedrowski made no changes to the revenue goals set for Jacobi by the Sales Planning Department. He explained that he routinely gives employees who are failing to achieve their goals specific criteria for improvement.

On June 6, 2003, Jacobi filed this lawsuit.

On June 23, 2003, Kiedrowski issued Jacobi a memo outlining her results on each of the items listed in the March 26 memo. On most of the items, Jacobi failed to meet 100% of the requirements.

On August 5, 2003, Kiedrowski terminated Jacobi for "performance deficiencies." In the termination letter, Kiedrowski states that Jacobi's "territory has consistently under performed" and that she failed to fully follow up on "the performance improvement activities required of [her.]" Kiedrowski further notes that Jacobi received a letter of counseling in September 2002 and a warning letter in November 2002 (both of which were from Jones) regarding her unacceptable performance. Kiedrowski determined that "[u]nder the Corporate Services Progressive Discipline Policy, the next step is termination" and terminated her. During his deposition, he testified that no other employee under his supervision has ever failed to meet revenue and performance improvement goals to the extent that Jacobi did for five consecutive quarters.

Jacobi subsequently filed another charge with the EEOC, alleging retaliatory discharge. A Notice of Right to Sue issued on this Charge on August 6, 2004.

## II.    LAW AND ANALYSIS

### A.    Motion to Strike

First, the Court will address the merits of FedEx Services's Motion to Strike. FedEx Services argues that the Court should strike Exhibits 203, 204, 205, 206, 211, 212, 214, 215, and 216 because they are unauthenticated, unsworn, uncertified and constitute inadmissible hearsay. Additionally, FedEx Services argues that the Court should also strike paragraphs 4, 14, 21, 23, 24, 25, 26, 28, and

33 of Jacobi's Statement of Disputed Facts and those portions of her memorandum in opposition to the Motion for Summary Judgment which rely on the improper exhibits. FedEx Services also moves the Court to strike certain identified comments in paragraphs 9, 10, 11, 16, 19, 20, 21, 23, 24, 26, 27, 28, 29, 31, 32, 34 , and 36 of Jacobi's statement of undisputed facts on the basis that they are merely Jacobi's allegations without any support in the admissible evidence.

In response, Jacobi filed a memorandum in opposition to the Motion to Strike and her own Motion for Leave, in which she seeks to submit an affidavit verifying certain of the information objected to by FedEx Services.

FedEx Services submitted a memorandum in opposition to Jacobi's Motion for Leave, arguing that the affidavit is untimely, contradicts her summary judgment brief, and contradicts her deposition testimony.

With regard to the untimeliness of Jacobi's affidavit, the Court finds that FedEx Services would suffer no prejudice by the filing of the affidavit given the current trial setting. Accordingly, Jacobi's Motion for Leave [Doc. No. 60] is GRANTED, and her affidavit will be filed in the record. As of this date, however, the affidavit submitted by Jacobi has been signed, but not notarized. Jacobi should submit a properly signed and notarized affidavit to be made part of the record in this matter no later than ten (10) business days from the date this Ruling is filed.[4]

FedEx Services has also raised valid objections to the admissibility of Jacobi's exhibits even with the affidavit. As FedEx correctly points out, Exhibits 203, 204, 205, and 206 could not have been provided to Jacobi during the course and scope of her employment. Exhibits 203 and 204 were

---

[4]Although the Court has concluded that FedEx Services's Motion for Summary Judgment should be granted in its entirety, it has considered Jacobi's affidavit, and the affidavit should be submitted in proper form for purposes of the record for appeal.

spreadsheets created by a FedEx Services paralegal in the context of this litigation,[5] and Exhibits 205 and 206 appear to be charts created by Jacobi's counsel using the information in Exhibits 203 and 204.

Further, even if Jacobi's counsel received these documents during the course of discovery, that does not remedy the fact that they appear to be hearsay.[6] For the same reason, Jacobi cannot simply state that Exhibits 214 and 216 were admissible because they "were provided to plaintiff's counsel by defendant through discovery." The Court must determine whether the documents are hearsay and, if so, whether they are admissible under an exception to the hearsay rule.

Exhibit 203 allegedly shows the revenue goals set for employees by the Sales Planning Department, and Exhibit 204 allegedly shows the revenue goals "locked in" by Jones. The Court uses the word "allegedly" because its information is based on an explanation provided by counsel in footnote 1 in Jacobi's memorandum in opposition to the Motion for Summary Judgment. Therein lies the problem. These documents are out-of-court statements which purport to provide certain information, according to Jacobi's allegations, and which Jacobi asks this Court to accept as true. In other words, these documents are hearsay.

The Court has considered whether the documents might be admissible as an admission by a party-opponent and thus "not hearsay," *see* Fed. R. Evid. 801(d)(2), but the documents standing alone do not make any statement. It is only with counsel's explanation that the Court can glean information from the documents.

---

[5] The Court does not assume that Jacobi intentionally misstated the source for the documents, but perhaps meant that she had obtained the information contained in these documents during the course and scope of her employment.

[6] The Court gives no credence to FedEx Services's disingenuous contention that the documents are not sufficiently authenticated when they were prepared by a company paralegal using company documents, and FedEx Services does not contend the information has been altered or is incorrect.

Additionally, these documents could be admissible under the business records exception to the hearsay rule, Fed. R. Evid. 803(6), if the data was compiled from information made at or near the time of the event by a person with knowledge, if the data was kept in the course of regularly conducted business, and if it was the regular practice of that business activity to compile such data. The problem is that Jacobi has failed to make any showing under Rule 803(6). While the Court can speculate that such information meets these requirements, FedEx Services is correct that it is Jacobi's burden to present evidence that is admissible under the Federal Rules of Evidence, and she has not laid the proper foundation for admissibility of Exhibits 203, 204, and, by extension, 205 and 206.

For the same reasons, Exhibits 211, 212, 214, 215, and 216 are also inadmissible hearsay.

FedEx Services's Motion to Strike [Doc. No. 54] is GRANTED IN PART, and Exhibits 203, 204, 205, 206, 211, 212, 214, 215, and 216 will not be considered by the Court in its ruling on the Motion for Summary Judgment, nor any arguments or disputed facts based on these exhibits.

## B.    Motions for Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.* The moving party cannot satisfy its initial burden simply by setting forth conclusory

statements that the nonmoving party has no evidence to prove its case. *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

**B.  Sexual Harassment**

Title VII forbids employers to take actions on the basis of sex that "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment is a form of sex discrimination prohibited under Title VII. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57 (1986). Louisiana's Anti-Discrimination Statute also prohibits sexual discrimination in the form of harassment.[7] *See* La. Rev. Stat. § 23:332.

FedEx Services contends that it is entitled to summary judgment on Jacobi's claims of sexual harassment on three bases: (1) any claim of quid pro quo sexual harassment fails as a matter of law because there is no causal connection between the alleged harassment by her supervisor and her later termination; (2) Jacobi has not alleged any actions sufficiently severe and pervasive to subject

---

[7]Because Louisiana's anti-discrimination law is substantively similar to Title VII, Louisiana courts routinely look to federal law for guidance in determining whether a viable claim has been asserted. *See e.g., Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1274 (5th Cir. 1989); *Tanner v. Reynolds Metals Co.*, 98-1456, 739 So. 2d 893, 899 (La. App. 1 Cir. 6/25/1999). Therefore, the Court will analyze Jacobi's sexual harassment claims under Title VII and state law simultaneously.

FedEx Services to liability for a sexually hostile work environment; and (3) Jacobi cannot show that her supervisor harassed her "because of" her sex.

### 1. Quid Pro Quo

As the Supreme Court has observed, "[c]ases based on threats which are carried out are referred to often as quid pro quo cases, as distinct from bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment. The terms quid pro quo and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility." *Burlington Indust. v. Ellerth*, 524 U.S. 742, 751 (1998). Nevertheless, the Supreme Court has also explained that if "a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *Id.* at 753-54.

In this case, however, Jacobi has failed to raise a genuine issue of material fact that her termination was caused by her refusal to accede to Jones's sexual demands. Assuming that Jones's alleged "drop your pants" comment was a sexual demand,[8] Jacobi was not terminated by Jones after responding "I don't think so" to his comment. She did not make a complaint until two months after this incident, and no adverse employment action was taken in the intervening period. In fact, Jacobi does not complain of any actions by Jones until *after she filed her complaint of sexual harassment*. Jacobi was then terminated over a year later by a different District Manager. Under these

---

[8]This is the only comment alleged to be a "sexual demand" and could certainly be interpreted more than one way.

circumstances, Jacobi has failed to make a causal connection between her refusal of Jones's alleged sexual demand and her later termination.

Jacobi's true argument is that Jones retaliated against her for making a sexual harassment complaint against him by increasing her revenue goals to levels that were impossible for her to meet and taking other steps to ensure that her performance was unacceptable. As result, when she was re-assigned to a new District Manager, she continued to suffer from the effects of Jones's retaliation. These allegations are addressed in the context of her retaliation claim, but are not sufficient to make the necessary causal connection for a qui pro quo claim of sexual harassment.

Accordingly, to the extent that Jacobi seeks to pursue her claims of sexual harassment under a quid pro quo theory, FedEx Services's Motion for Summary Judgment is GRANTED, and her Title VII and state anti-discrimination claims are DISMISSED.

## 2. Hostile Work Environment

Although the Court has determined that Jacobi cannot make a showing under a quid pro quo theory, the analysis does not end here. Rather, the Court must determine "whether the supervisor's sexual harassment was nevertheless so severe or pervasive that it created a 'hostile environment.'" *Thompson v. Naphcare, Inc.,* No. 04-60028, 117 Fed. Appx. 317, 2004 U.S. App. LEXIS 23697 at *11 (5th Cir. Nov. 11, 2004).

To prevail on a sex-based harassment claim alleging hostile work environment, the plaintiff must prove: (1) she belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on sex; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Green v. Adm'rs. of the Tulane*

15

*Educ. Fund*, 284 F.3d 642, 655 (5th Cir. 2002) (internal citation omitted). When the harassment is committed by a supervisor with immediate or successively higher authority over the harassment victim, the employee need only prove the first four elements. An employer may raise an affirmative defense by showing that it exercised reasonable care to prevent and promptly correct the harassing behavior and that the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer. *Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998).

In determining whether a workplace constitutes a hostile work environment, courts should look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* at 23. Title VII does not prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Oncale v. Sundowner Offshore Svcs. Inc.*, 523 U.S. 75, 81 (1998). A recurring point in the Supreme Court's hostile environment cases is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Faragher*, 524 U.S. at 788. The standards set forth by the Supreme Court seek to ensure that Title VII does not become a "general civility code." *Oncale*, 523 U.S. at 80. Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788 (quoting B. LINDEMANN & D. KADUE, SEXUAL HARASSMENT IN EMPLOYMENT LAW 172 (1992)). The Supreme Court has made it clear that conduct must be so extreme, so severe and pervasive, as to amount to a change in the

16

terms and conditions of employment. *Id.*

According to Jacobi, Jones engaged in the following incidents[9] of sexual harassment:

(1)     When he came to her market for individual meetings, he told her that he "liked" her and asked her to go to dinner and/or for drinks;

(2)     He suggested that she "drop [her] pants" if he won a game of pool;

(3)     He intentionally sat next to her at a crowded table during a company dinner and placed his leg next to hers; and

(4)     While on sales calls with her, he nudged her foot on at least two occasions and mouthed the word "bitch."

These actions are neither severe nor pervasive enough to constitute a hostile work environment.[10]

*See Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 872-75 (5th Cir. 1999) (statement

that plaintiff's elbows were the same color as her nipples, commenting on the size of plaintiff's

thighs while pretending to look under her desk, and attempting to look down plaintiff's clothing were

insufficient to create a hostile work environment); *see also Hockman v. Westward Communs., LLC,*

407 F.3d 317, 326 (5th Cir. 2004) (plaintiff's claims that the alleged harasser (1) once made a remark

to her about another employee's body, (2) once slapped her on the behind with a newspaper, (3)

---

[9]Jacobi also alleges that after she reported Jones's "drop your pants" comment, he became "rude" to her and other employees, both male and female. Even if Jones's rudeness constituted a hostile work environment, which it does not, such conduct does not suggest that Jacobi was subjected to a hostile work environment "because of" her sex. *See Oncale,* 523 U.S. at 80 ("[C]areful attention to the requirements of the statute" is necessary to prevent the transformation of Title VII into a "general civility code for the American workplace.").

[10]Jacobi previously filed a Motion to Compel seeking to obtain FedEx Services internal file on its investigation of a sexual harassment complaint against Jones by Lawanda Nelson. Jacobi argued that the file was relevant to FedEx Services's affirmative defense under *Farragher/Ellerth.* Because the Court concluded that Jacobi has failed to meet her burden of showing that she was subjected to severe and pervasive sexual harassment, the Court need not reach the issue of FedEx Services's affirmative defense. Therefore, Nelson's file is irrelevant.

"grabbed or brushed" against her breasts and behind, (4) once held her cheeks and tried to kiss her, (5) asked her to come to the office early so that they could be alone, and (6) once stood in the door of the bathroom while she was washing her hands were "perhaps even less egregious than that alleged in *Shepherd*," and, "[a]t best, . . . are on the same plane as those in *Shepherd*. Shepherd's allegations were insufficient in that case [to survive summary judgment,] and Hockman's are insufficient here.").

Accordingly, to the extent that Jacobi seeks to pursue her claims of sexual harassment under a hostile work environment theory, FedEx Services's Motion for Summary Judgment is GRANTED, and her Title VII and state anti-discrimination claims are DISMISSED.

### C.     Retaliation

In order to state a prima facie case of retaliation, Jacobi must show that (1) she engaged in an activity protected by law;  (2) an adverse employment action occurred;  and (3) there was a causal connection between the participation in the protected activity and the adverse employment action. *See Shackleford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407-408 (5th Cir. 1999).  The causal link required by the third prong of the prima facie case does not rise to the level of a "but for" standard. *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002) (citation omitted).  If a plaintiff makes a prima facie showing, then "an inference of retaliatory motive" is raised. *Fierros v. Texas Dep't of Health*, 274 F.3d 187, 191 (5th Cir. 2001) (citing *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001)).

To overcome this retaliatory inference, the defendant must produce evidence of a legitimate nonretaliatory purpose for the employment action. *Gee*, 289 F.3d at 345 (citation omitted); *see also Fierros*, 274 F.3d at 191.

18

Finally, if the defendant satisfies its burden of production, the plaintiff must prove that the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose.[11] *Gee*, 289 F.3d at 345.

As FedEx Services admits, Jacobi clearly meets the first two prongs of her prima facie case: she engaged in an activity protected by law by complaining of sexual harassment and filing an EEOC charge, and she suffered an adverse employment action when she was terminated. The parties dispute, however, whether there was a causal connection between Jacobi's participation in the protected activity and the adverse employment action.

Jacobi contends that following her report of sexual harassment on May 1, 2002, she was retaliated against when her revenue goals were increased, she was denied pay increases, and she was given lower performance evaluations. Although Jacobi's supervision was transferred to another District Manager, Kiedrowski, she contends that he relied on the revenue goals enhanced by Jones in determining that her performance was not acceptable. Thus, she contends that Jones's retaliatory acts culminated in her termination by Kiedrowski more than one year later in August 2003.

A plaintiff may establish a causal link "when the evidence demonstrates that the employer's decision to terminate was in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001). However, the Court's focus is on the knowledge and actions of the final decisionmaker. *Gee*, 289 F.3d at 346. In this case, the final decisionmaker was Kiedrowski. Kiedrowski testified that no one from FedEx Services informed him that Jacobi

---

[11]Jacobi has not alleged that this is a mixed motive case. Accordingly, the Court need not consider whether the Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), or the Fifth Circuit's decision in *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir.2004), affects the analysis. *See Septimus v. University of Houston*, 399 F.3d 601, 607 n.7 (5th Cir. 2005).

previously made a complaint of sexual harassment, but that Jacobi herself "may have mentioned something about it." He could not recall any specific information about her claim. He also recalled Jacobi "saying something about a retaliation [claim] against . . . some other manager in Operations," but stated that Jacobi did not mention retaliation against her by any manager in sales, including Jones. Although Kiedrowski's knowledge of Jacobi's complaint was limited, given the minimal showing required at the prima facie stage, this evidence may be sufficient to show that the complaint "was not wholly unrelated to the termination." *See Medina*, 238 F.3d at 684.

Even if Kiedrowski's knowledge was insufficient, however, Jacobi could establish a causal link if he acted as the "cat's paw" for Jones's retaliation. *See Long v. Eastfield College*, 88 F.3d 300, 307 (5th Cir. 1996) (quotation omitted); *see also Gee*, 289 F.3d at 346. Jacobi alleges that she did not come under the supervision of Kiedrowski with a clean slate. She brought with her the same revenue goals, a low score on her latest performance review, a September 25, 2002 Letter of Counseling for Unacceptable Performance, and a November 25, 2002 Letter of Warning for Unacceptable Performance. Kiedrowski testified by affidavit that "[i]n reviewing . . . Jacobi's performance through March of 2003, I noticed that she had failed to meet her revenue goals for five consecutive quarters. Accordingly, on or about March 26, 2003, I issued her a memo outlining specific items that I expected her to accomplish to improve her revenue numbers." If, as Jacobi contends, Jones deliberately acted to prevent her from meeting her revenue goals[12] and then Kiedrowski relied on her resulting failure to place in her what was essentially a probationary mode, then he unconsciously acted as the cat's paw

---

[12]Given the Court's ruling on the Motion to Strike, the Court takes no position whether or not Jones raised Jacobi's revenue goals other than the one occasion to which he admits. However, whether or not he raised her revenue goals, she also testified that he deliberately failed to obtain special rates for two potentially large customers which would have allowed her to meet her revenue goals, as well as denying her other tools provided to co-workers.

for Jones's retaliation. This, combined with his limited knowledge of her complaint of sexual harassment, is sufficient to establish the third prong of her prima facie case.

Because Jacobi has met her prima facie burden, the burden of production shifts to FedEx Services to produce a legitimate, non-retaliatory reason for her termination. FedEx Services has responded with such a reason: that Jacobi failed to meet Kiedrowski's performance expectations. Jacobi does not dispute that she failed to meet her revenue goals for five consecutive quarters, and the evidence is clear that she did not complete all the tasks assigned to her by Kiedrowski in March 2003. Thus, FedEx Services has met its burden of production.

The burden shifts back to Jacobi to show that her termination for poor performance was merely pretext for retaliation. To meet this burden, she must rely on more than allegations, however. Certainly, she alleges that Jones raised her revenue goals to impossible levels, but she has failed to provide the Court with admissible evidence to support those allegations. What remains is her deposition and affidavit testimony that Jones failed to obtain special pricing for two potentially large-volume customers in time for her to meet her revenue goals for one quarter and that he also failed to give her the same sort of supplies that he did other Account Executives. Accepting this testimony as true, Jacobi has perhaps accounted for her failure to meet her revenue goals for one quarter or maybe even two quarters.

However, when Jacobi began reporting to Kiedrowski, she had failed to meet her revenue goals for four consecutive quarters. Even if this Court had been properly presented with Exhibits 203 and 204, purporting to show her increased revenue goals for the last quarter of 2002 and the first quarter of 2003, and even if Jones should have reduced her revenue goals because of the loss of the Shreveport market, such evidence would only account for two of the five quarters. Jacobi has provided no evidence to dispute the fact that she failed to meet her revenue goals for at least two more of the five

21

quarters leading up to her termination.

Once Kiedrowski became Jacobi's District Manager, he admits that he looked at her past performance, but he has also provided affidavit testimony that the revenue goals he gave to Jacobi were provided by the Sales Planning Department in Memphis, not by Jones. There is no evidence that the Sales Planning Department was influenced by Jones to artificially inflate Jacobi's goals. Even if Kiedrowski asked more of Jacobi than he did other employees because of her performance history,[13] the objective facts show that she failed to comply with the deadlines set in his action plan, and she failed to meet her revenue goals under a new District Manager. The Court finds that Jacobi has failed to raise a genuine issue of material fact for trial on pretext.

Accordingly, FedEx Services's Motion for Summary Judgment on Jacobi's retaliation claim is GRANTED.

## III. CONCLUSION

For the foregoing reasons, Jacobi's Motion for Leave to File Plaintiff's Affidavit [Doc. No. 60] is GRANTED, and Jacobi's affidavit is ORDERED filed in the record of this matter. Plaintiff must submit a properly signed and notarized affidavit to the Clerk of Court no later than ten (10) business days from the date of this Judgment.

FedEx Services's Motion to Strike Certain Exhibits and Portions of Plaintiff's Statement of Disputed Facts and Brief in Opposition to Defendant's Motion for Summary Judgment [Doc. No. 54] is GRANTED IN PART. The Court has not considered Plaintiff's Exhibits 203, 204, 205, 206, 211,

---

[13]Jacobi relies on the testimony of a former FedEx Services District Manager, Rick Chester, that the goals set by Kiedrowski were unreasonable. However, Chester's testimony is insufficient to establish pretext by Kiedrowski when there is no evidence that he had a retaliatory motive against Jacobi.

212, 214, 215, and 216, nor any arguments or disputed facts based on these exhibits in its ruling on

FedEx Services's Motion for Summary Judgment.

Finally, FedEx Services's Motion for Summary Judgment [Doc. No. 35] is GRANTED, and

Jacobi's claims are DISMISSED WITH PREJUDICE.

Monroe, Louisiana, this ___12___ day of _____July_____, 2005.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE